UNITED STATES of America, Appellee,

v.

James Arthur PARKER, Appellant.

UNITED STATES of America, Appellee,

v.

Melvin WARD, Appellant.

UNITED STATES of America, Appellee,

v.

Bobby TODD, Appellant.

Nos. 79–1728, 79–1730 and 79–1746.

United States Court of Appeals,
Eighth Circuit.

Submitted Dec. 5, 1979.

Decided April 14, 1980.

Rehearing in Nos. 79–1728 and 79–1746
Denied June 23, 1980.

Ray C. Conrad, Jr., Asst. Federal Public Defender, Springfield, Mo., argued, Thomas M. Bradshaw, Acting Federal Public Defender, Kansas City, Mo., on brief, for appellant, Parker.

Donald R. Cooley, Smith & Cooley, Springfield, Mo., for appellant, Ward.

Ben K. Upp, Springfield, Mo., for appellant, Todd.

Robert G. Ulrich, Asst. U. S. Atty., and Michael A. Jones, Asst. U. S. Atty., Springfield, Mo., argued, Ronald S. Reed, Jr., U. S. Atty., Kansas City, Mo., on brief, for appellee.

Before HEANEY, BRIGHT and ROSS, Circuit Judges.

HEANEY, Circuit Judge.

These consolidated appeals come to us from the United States District Court for the Western District of Missouri. Melvin Ward, Bobby Todd and James Parker each appeal from jury verdicts of guilty on counts of robbery, felony murder and premeditated murder. We affirm the convictions of Ward and reverse the convictions of Todd and Parker.

I

THE FACTS

On April 30, 1977, a hunter discovered the necrotic remains of Frederick E. Williams in a remote wooded area within the confines of Fort Leonard Wood, Missouri. Williams had been a private first class in the army stationed at Fort Leonard Wood. He had returned from Christmas leave on January 2, 1977, but his whereabouts had been unknown since about January 5, 1977.[1]

On May 2, 1977, Dr. Gerald A. Rappe, an army pathologist, performed an autopsy and determined that Williams had been dead for at least six weeks to two months. He also discovered "a massive hole lined by a real straight line fracture" in the right side of Williams' skull. He determined that this hole was not the result of natural decomposition but rather was the result of a "horrendous blow" struck from behind with a "long * * * lean instrument, * * * a heavy unyielding instrument, like a pipe or a tire iron or something very strong and very unyielding." He could not positively determine, however, whether the blow had been struck before or after death and he listed the cause of death as unknown. Nevertheless, he noted that the skull fracture was "extremely suspicious, * * * most probably man made and * * * most probably a lethal fracture if made prior to death."

Almost two years after Williams' body was found, each of the three defendants

1. Initially, army records indicated that Williams was hospitalized. Hospital records showed, however, that he had never been ad- mitted. In mid-February, 1977, the army listed Williams as AWOL.

now before us gave statements variously implicating themselves and each other in the events leading to the death of Williams. Each admitted to being present at the recreation center on the fort in early January, 1977, when the robbery of Frederick Williams was planned. They all admitted to traveling with Williams by car off the base to the Birdland Lounge on the pretense that Todd was to pick up marijuana to sell to Williams. All agreed that at the moment they were getting into the car to leave the Birdland Lounge, Ward hit Williams on the head with a tire iron. All further agreed that thereafter they returned to the fort, drove to a remote area and hauled Williams out into the woods where he was left. Their statements differed, however, as to whether money was taken from Williams while he was on the base, and whether he was alive when abandoned. These matters bear on essential elements of the federal crimes charged.

On June 29, 1979, the district court consolidated for trial the indictments against Ward, Todd and Parker. The defendants' motions for severance were denied and their cases were jointly tried to a jury. All of their statements were read to the jury, each with instructions that the statement could be used as evidence only against the issuing defendant. All of the statements were partially redacted; the names of the codefendants were erased and replaced with letters. None of the defendants testified at trial. The jury returned verdicts against all three defendants on the three charges submitted.[2]

## II

## THE BRUTON–PARKER ISSUE

The principal issue raised on appeal is whether the trial court erred in refusing to sever these cases before trial and in admitting statements by nontestifying codefendants at their joint trial. All three defendants raise this issue and argue that their Sixth Amendment right to confront the witnesses against them was violated by the introduction of the statements of codefendants who refused to take the stand.

In *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), the Supreme Court established the general principle that the admission in a joint trial of the "powerfully incriminating extrajudicial statements of a codefendant" not subject to cross-examination impermissibly infringes on the constitutional rights of other defendants. *Id.* at 135–136, 88 S.Ct. at 1628. The protective instruction to the jury that the statement could be used only against its issuer was held insufficient to cure the defect: "[W]e cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." *Id.* at 137, 88 S.Ct. at 1628.

In *Harrington v. California*, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), it was established that a *Bruton* error, the admission of the statement of a nontestifying codefendant, might nevertheless not require reversal if the error was harmless beyond a reasonable doubt. This harmless error doctrine has also been invoked in cases involving so-called "interlocking confessions." *See Schneble v. Florida*, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972), and *United States v. Walton*, 538 F.2d 1348 (8th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976).[3] In such cases, we must determine, in the light of the *Harrington/Schneble* standard, whether "there is a reasonable possibility that the improperly admitted evidence contributed to the conviction." *Schneble v. Florida, supra*, 405 U.S. at 432, 92 S.Ct. at 1060. If so,

---

**2.** The grand jury returned a separate five-count indictment against each of the defendants. Count I of each indictment charged the named defendant with conspiracy to commit kidnapping, robbery and murder in violation of 18 U.S.C. §§ 371 and 1201(c). This count was dismissed as duplicative prior to trial by the district court. Count II charged the named

defendant with kidnapping. The district court directed a verdict of acquittal on this count. Counts III, IV and V charged robbery, premeditated murder and felony murder respectively. These counts were submitted to the jury.

**3.** *See* note 5, *infra*.

the conviction must be reversed. If not, the conviction may be affirmed.

In *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), the Supreme Court again faced the Sixth Amendment questions presented by interlocking confessions. Four of the Justices appeared willing to forsake the harmless error inquiry for the broader proposition that the admission of interlocking confessions with proper limiting instructions simply does not violate the Constitution. *Id.*, at 69–75, 99 S.Ct. at 2137–2140, 60 L.Ed.2d at 721–725 (Rehnquist, J., with Burger, C. J., Stewart, J. and White, J.). They distinguished the interlocking confession situation from the *Bruton* case primarily on the theory that the right to cross-examination would never be of value when the defendant had admitted his own guilt. *Id.*, at 72, 99 S.Ct. at 2139, 60 L.Ed.2d at 723. They did not, however, attempt to delineate when statements given by codefendants would be sufficientlyhinterrelated and inculpatory to become "interlocking confessions."

Four other Justices adhered to the harmless error analysis. *Id.* at 77, 99 S.Ct. at 2141, 60 L.Ed.2d at 726 (Blackmun, J., concurring in part); *Id.* at 80, 99 S.Ct. 2143, 60 L.Ed.2d 728 (Stevens, J., with Brennan, J. and Marshall, J., dissenting).[4] Justice Blackmun underscored the need for a flexible harmless error approach in order to protect the rights of those defendants who are unfairly prejudiced by inadmissible evidence.

> The fact that confessions may interlock to some degree does not ensure, as a per se matter, that their admission will not prejudice a defendant so substantially that a limiting instruction will not be curative. The two confessions may interlock in part only. Or they may cover only a portion of the events in issue at the trial. Although two interlocking confessions may not be internally inconsistent, one may go far beyond the other in implicating the confessor's codefendant. In such circumstances, the admission of the confession of the codefendant who does not take the stand could very well serve to prejudice the defendant who is incriminated by the confession, notwithstanding that the defendant's own confession is, to an extent, interlocking. I fully recognize that in most interlocking confession cases, any error in admitting the confession of a nontestifying codefendant will be harmless beyond a reasonable doubt. Even so, I would not adopt a rigid per se rule that forecloses a court from weighing all the circumstances in order to determine whether the defendant in fact was unfairly prejudiced by the admission of even an interlocking confession. Where he was unfairly prejudiced, the mere fact that prejudice was caused by an interlocking confession ought not to override the important interests that the Confrontation Clause protects.

*Id.* at 79, 99 S.Ct. at 2142, 60 L.Ed.2d at 727 (Blackmun, J., concurring in part).

We continue to believe that a harmless error analysis is preferable to a rigid per se rule and, thus, adhere to the approach elucidated by Mr. Justice Blackmun in *Parker*.[5] Here, although the statements of the defendants are mutually reinforcing in many respects, they vary in significant detail on the events necessary to establish certain elements of the crimes charged. The issue now before us, therefore, is whether admission of these statements was reversible error as to any or all of the defendants.

It is essential to the robbery, felony murder and premeditated murder charges in this case that the actions constituting these offenses took place "within the special maritime and territorial jurisdiction of the United States." 18 U.S.C. §§ 1111, 2111. That term, as defined in 18 U.S.C. § 7(3), and as found by the district court, would

---

**4.** Mr. Justice Powell took no part in the consideration of the case.

**5.** Prior to *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979), this Court adopted a harmless error standard in substance if not in form. *See United States v. Walton*, 538 F.2d 1348 (8th Cir.), *cert. denied*, 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976).

include all relevant portions of Fort Leonard Wood but not any off-base property.[6] Since the statement of each defendant varies somewhat as to the location of both the events leading to Williams' death and the alleged robbery, each crime and each individual's statement shall be treated separately.

### A. The location of the events leading to death.

■ The determination of the location of a murder charged under 18 U.S.C. § 1111 is governed by 18 U.S.C. § 3236, which reads in pertinent part as follows:

> In all cases of murder or manslaughter, the offense shall be deemed to have been committed at the place where the injury was inflicted, * * * or other means employed which caused the death, without regard to the place where the death occurs.

The statements of all three defendants indicate that the blow to Williams' head was administered at the Birdland Lounge, which is off base, and, therefore, outside of the reach of the federal government's murder statute. See 18 U.S.C. § 1111. Consequently, if the blow to the head alone killed Williams, no federal offense was committed. The government, however, argues that it was not the blow to the head, but the abandonment of Williams in the freezing January temperatures that was the "means employed which caused the death." Since the abandonment took place on the fort, the federal statute would apply.

Unfortunately, § 3236 is silent as to whether the term "which caused the death" refers only to the dominant cause of death or includes contributing causes as well. We have been unable to find any cases construing the statute. The district court, however, adopted a proximate cause analysis

and instructed the jury that the government must prove, beyond a reasonable doubt, that Williams died "as a proximate result of exposure to the elements within the boundaries of Ft. Leonard Wood." No objection was made to this instruction and it is, therefore, the law of the case. It is clear then that against each defendant, the government had to prove, beyond a reasonable doubt, that Williams died not from the blow to the head but from exposure. In view of Dr. Rappe's testimony that the blow to the head was "horrendous," causing a fracture which was "most probably * * * lethal * * * if made prior to death," the government's burden of showing that Williams lived long enough to die of exposure was not inconsequential. It was, therefore, essential to the government's case that it prove, at a minimum, that Williams was alive when he was left in the woods. It is on this very point, however, that the statements of the defendants are subject to diverse interpretations.

■ Defendant Ward's statement was both clear and damning. He admitted that: "As I was walking away from [where we left Williams in the woods] I could see that his legs were moving a little. He also mumbled when we took him from the car. I could'nt [sic] understand what he was saying." Later in his statement, Ward was asked how far into the woods he put Williams. He replied: "About 30 feet into the woods we sat him against a tree but he just slid down. When he slid down he moned [sic]."[7]

Todd's statement is ambiguous on this point. That statement, portions of which are in a question and answer format, reads in pertinent part as follows:

> Q. When they put WILLIAMS in the /j/___$^{BT}$ [8] did he move or did you know that he was Dead [sic]?

---

6. Whether all of the Fort Leonard Wood lands involved in this case fell within the 18 U.S.C. § 7(3) definition was hotly contested at trial. The district court ruled, as a matter of law, that they did.

7. The government argues that "moned" means "moaned" and, therefore, indicates that Wil-

liams was alive. Defense counsel argues that "moned" may mean "moved" which does not as clearly indicate that Williams was still alive.

8. "BT" in this figure represents the handwritten initials of Bobby Todd.

A. SHANNON [9] said that he could be dead. I said that he was'nt [sic] and then Ward [10] said that he was'nt [sic] dead and he just hit him soft.

Q. It was cold outside. Did you see F. WILLIAMS breathing when they put him in the woods?

A. No.

The government argued that, in the context of Todd's statement, "/j/___ $^{BT}$" meant "woods" and that Todd's response to this question indicates that Williams was alive when abandoned on the fort. The defense argues that "/j/___ $^{BT}$" is ambiguous as to location and that, in any event, Todd's response to both questions leaves considerable doubt as to whether Williams had survived the trip from Birdland back to the post.

Parker's statement is similarly open to various interpretations:

Q. Was WILLIAMS alive when they put him in the woods?

A. He was unconscious and not moving.

    \*    \*    \*    \*    \*    \*

Q. Did WILLIAMS say anything afetr [sic] he was hit?

A. No.

In light of these statements, the question is whether any or all of the defendants were unfairly prejudiced by the admission of the statements of their codefendants at trial. We conclude that both Todd and Parker were so prejudiced. We have little doubt that their statements, taken individually, were sufficiently inculpatory so that the jury *may* have found that exposure was the cause of death. Nevertheless, there is a reasonable possibility that Ward's improperly admitted statement contributed to their convictions. *See Schneble v. Florida, supra.* There can be little doubt that Ward's statement added "substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination \* \* \*." *Bruton v. United States, supra,* 391 U.S. at 128, 88 S.Ct. at 1623. We, therefore, cannot say beyond a reasonable doubt that the admission of that statement was harmless. Consequently, we reverse the premeditated murder and felony murder convictions of both Todd and Parker.[11]

Ward also contends that he was unfairly prejudiced by the introduction of the statements of his codefendants. In particular, he contends that Parker's statement contributed to his conviction on premeditated murder. Parker's statement included the following:

Q. Was that the plan. Hit him with the tire iorn [sic].

A. Ward [12] had said at the Walker Recreation Center that he was going to use the tire iorn [sic].

In our view, there is no reasonable possibility that this statement contributed to

---

**9.** Shannon, who was referred to in all the statements as given to the jury, was not prosecuted. When asked at oral argument about the disposition of the charges against Shannon, the government's attorney advised the Court that the government did not consider the statement obtained from Shannon to be sufficiently inculpatory to obtain a verdict against him.

**10.** As read to the jury, Todd's statement was altered so that Ward's name was replaced with the letter "A." Since in his own statement Ward admitted that he was the one who struck Williams, it was clear to the jury who "A" was. Redaction of this type is seldom effective at protecting codefendants. *See Parker v. Randolph, supra,* 442 U.S. at 89 n. 12, 99 S.Ct. at 2148 n. 12, 60 L.Ed.2d at 734 n. 12 (Stevens, J., dissenting); Dawson, *Joint Trials of Defendants in Criminal Cases: An Analysis of Efficiencies and Prejudices,* 77 Mich.L.Rev. 1379, 1414–1415 (1979). It was particularly ineffec-

tive in this case because only the names of the codefendants were redacted. The names of others implicated but not on trial, such as Shannon, were read to the jury.

**11.** We note that both may, of course, be tried again on these charges. *See Burks v. United States,* 437 U.S. 1, 14–16, 98 S.Ct. 2141, 2148–2149, 57 L.Ed.2d 1 (1978); *United States v. Tateo,* 377 U.S. 463, 465–466, 84 S.Ct. 1587, 1588–1589, 12 L.Ed.2d 448 (1964).

**12.** As with Todd's statement, *see* note 10, *supra,* Parker's statement was altered when read to the jury so that Ward's name was replaced with the letter "A." Since Parker's statement also identified "A" as the person who hit Williams with the tire iron and since Ward admitted that he was the one who struck Williams, it was again clear to the jury who "A" was.

Ward's conviction. Ward's own statement provides the best and most convincing evidence that the killing was premeditated.[13] Since Ward corroborated "his codefendant's statements by heaping blame onto himself," *Parker v. Randolph, supra,* 442 U.S. at 63, 99 S.Ct. at 2134, 60 L.Ed.2d at 723 (Rehnquist, J., in a portion of the opinion joined by three other Justices), we must conclude that the introduction of the statements of his codefendants was harmless error.

B. *The location of the robbery.*

Eighteen U.S.C. § 2111, under which the defendants were charged, reads as follows:

Whoever, within the special maritime and territorial jurisdiction of the United States, by force and violence, or by intimidation, takes from the person or presence of another anything of value, shall be imprisoned not more than fifteen years.

The trial court instructed the jury that to obtain a conviction on the robbery count, the government had to prove three elements beyond a reasonable doubt: "First, on or about January 5, 1977, Frederick Williams had in his possession or on his person money; second, the defendant—this applies to each defendant—the defendant took and carried away money from Frederick Williams by force, and third, the taking[14] occurred within the boundaries of Ft. Leonard Wood, Missouri."

Again, Ward's statement was by far the most incriminating, both of himself and of his codefendants. As submitted to the jury, the statement read in part as follows:

Q. Did everyone plan to rob WILLIAMS?

A. Yes.

\*   \*   \*   \*   \*   \*

Q. Who took the money off WILLIAMS?

A. SHANNON took the money out and split it up. *I took the money from his walet* [sic]. *M. W*

Q. How much money did everyone get?

A. I know that I got about $30.

Q. Where did you take the money from?

A. I took his wallet from his back pocket and the money from that.

\*   \*   \*   \*   \*   \*

Q. Whaen [sic] did you take the wallet from his pocket?

A. When we put him in the woods.

Q. Was there any other money taken from the body of WILLIAMS?

A. I saw SHANNON with *some* money.

Q. Did he split this money up amoung [sic] the occupants of the car?

---

13. A portion of Ward's statement reads as follows:

Q. What prompted you to take the tire tool from the rear floor of the car and hit WILLIAMS?
A. [Todd] *said hit him* [.]
Q. When did you pick the tire tool up?
A. [Todd] was starting to pick it up. I grabbed *it.* [Todd] said hit him and I did.
Q. Prior to this did you have any idea that you were going to hit him?
A. Everyone thought that they would get him drunk and then roll him.
Q. Where did this plan come from.
A. While we were at Walkers [the on-base recreation center]. [Emphasis added indicates the portion of the statement handwritten by Melvin Ward.]

This statement, of course, indicates Ward's state of mind at the time he delivered the blow to Williams' head. The more important issue

in this case is Ward's state of mind concerning the abandonment. Ward admitted that after he struck Williams and pushed him into the back seat of the car, they drove to a secluded wooded area on base where Ward, knowing that Williams was mumbling and moving his legs a little, left him. This abandonment occurred, according to Ward, late in the evening at a time when other evidence indicated that the temperature did not rise above freezing for many days. This evidence alone convincingly demonstrates that Ward's actions were deliberately death-inducing.

14. The statements of all three defendants indicate that planning for the robbery occurred at the recreation center on Fort Leonard Wood. While the site of the planning may be important to the charge of conspiracy to commit robbery (a charge that was dismissed before trial in this case, *see* note 2, *supra* ), it is not relevant to the location of the robbery itself.

A. I saw him give some to TODD.[15]

Q. Where did this take place at?

A. When we were almost to the gate of Ft Leonard Wood.

\* \* \* \* \* \*

Q. Did anyone take anything else from the body of WILLIAMS?

A. I think SHANNON was going through his pockets on the \* \* \* way back to post. I did'nt [sic] see if he got anything.

Q. What happened to the Marihuana that TODD had sold WILLIAMS?

A. I saw SHANNON roll one joint and give the Marihuana back to TODD. This was on our way back from the club. I don't know where it came from. [Emphasis indicates the portion of the statement handwritten or initialed in pen by Melvin Ward.]

The statement of Bobby Todd was significantly less clear on the location of the robbery. Speaking of the group's return from Birdland, Todd's statement reads:

We went straight through the light and on to the Front Gate of Ft. Leonard Wood, MO. About the time we were at a sign which said something about driving safley [sic] \* \* \* or total of deaths during the year that is located near the front gate the money that was taken from F. WILLIAMS started to be split up. I was asked if I wanted to have some of the money. They even handed it to me, but I told them that I did'nt [sic] want any of it. At this time I saw money

comming [sic] from the back seat of the car being passed to J. REVERE.[16]

The government argues that the place of transfer described by Todd is within the "special maritime and territorial jurisdiction of the United States," [17] see 18 U.S.C. § 2111. Its position is that although Todd's statement does not indicate where the actual taking transpired, it indicates that the division of stolen property occurred on land within federal jurisdiction and that this is all that is needed.

■ Distribution of the robbery assets, however, is not an element of the crime of robbery; [18] taking is. See 18 U.S.C. § 2111. The trial court clearly instructed the jury that one of the things that the government had to prove beyond a reasonable doubt was that the "taking occurred within the boundaries of Ft. Leonard Wood, Missouri." We cannot say, as we must in order to affirm Todd's robbery conviction despite the erroneous admission of Ward's prejudicial statement, that there is no reasonable possibility that the improperly admitted evidence contributed to the conviction. See Schneble v. Florida, supra. We must, therefore, reverse Todd's robbery conviction.[19]

We now consider Parker's statement. It is quickly apparent that he, even more than Todd, was unfairly prejudiced by the introduction of Ward's statement at the trial. The following are the relevant portions of Parker's statement:

Q. Who got the money from the robbery?

---

**15.** Again, although the statement submitted to the jury referred only to "B," Todd's admission that he sold Williams the marijuana made it clear to the jury that "B" was Todd. See note 10, supra.

**16.** Todd's unredacted statement occasionally referred to "J. REVERE (PARKER)" and occasionally to just "J. REVERE." As submitted to the jury, "D" replaced either reference. It was clear from the context that "D" meant Parker.

**17.** The government offered testimony to establish that the sign that Todd described was, although outside the fort's gate, within federal jurisdictional boundaries.

**18.** As with the planning of the robbery, the location of the defendants at the time when the assets of the robbery are distributed may be relevant to a conspiracy charge. Here, however, the conspiracy charge was dismissed before trial. See notes 2 and 14, supra.

**19.** The government also argues that Todd's robbery conviction can be supported by his admission that he retained the proceeds of the marijuana sale. He felt that this was "[his] part of the money for what happened." Even if we accept that retention of the money was a taking by force within the meaning of 18 U.S.C. § 2111, it is clear that this taking occurred at Birdland and was, therefore, not a § 2111 offense.

A. I only know that I got $56.00 from WARD.[20]

\*   \*   \*   \*   \*   \*

Q. Do you know how much money WILLIAMS had on his person?

A. It was so quick and they just gave me some money.

\*   \*   \*   \*   \*   \*

Q. Did you drive directly to birdland [sic] and back to Ft Leonard Wood after the robbery of WILLIAMS?

A. Yes.

Q. Why did the robbery have to go down at Birdland Lounge instead of the Walker Recreation Center?

A. We did it out there because everyone was afraid of getting caught.

Clearly, Parker's statement does little to establish that the taking occurred within the boundaries of Fort Leonard Wood. The government offered no independent evidence other than the statements of Parker's codefendants which were, of course, inadmissible to the consideration of his case, that the robbery took place on base. Consequently, we again cannot say that the admission of the codefendants' statements was harmless beyond a reasonable doubt. We must, therefore, also reverse Parker's robbery conviction.[21]

### III

### WARD'S CONTENTIONS ON APPEAL

A. *Authority to prosecute as an adult.*

Ward first contends that he was improperly prosecuted as an adult. Ward was seventeen years old at the time of the events for which he was tried. He was twenty years old at the time of trial. The initial proceedings against Ward were brought under the juvenile delinquency statutes, 18 U.S.C. § 5031, *et seq.* On May 4, 1979, however, a United States Attorney filed a certification and on May 7, 1979, moved the district court to transfer Ward's status so that he could be tried as an adult.

It is the certification and motion for transfer that Ward here contests.

Eighteen U.S.C. § 5032 establishes guidelines for determining when juvenile delinquency proceedings may be had in the federal district court and for when juveniles may be tried as adults. Under this statute, federal jurisdiction over juvenile delinquency proceedings fails unless the Attorney General certifies that certain conditions exist. Similarly, a juvenile cannot be tried as an adult unless certain conditions exist and the Attorney General makes an appropriate motion of transfer. By 28 C.F.R. § 0.57 (1979), however, the Attorney General delegated to the Assistant Attorney General in charge of the Criminal Division and his Deputy Assistant Attorneys General the power "vested in the Attorney General by sections 5032 and 5036 \* \* \* relating to criminal proceedings against juveniles." The regulation also authorizes the Assistant Attorney General (but not the Deputy Assistant Attorneys General) to redelegate these powers to United States Attorneys.

■ The certification, information and motion for transfer in Ward's case were all signed by a United States Attorney. Ward contends that all were signed without authority and that, as a consequence, the district court never attained jurisdiction over the matter. The first prong of his argument is that since the § 0.57 delegation relates only to "criminal proceedings against juveniles," it does not include a delegation of the power to move for adult prosecution of juveniles. We, however, find no such limitation in the language of the regulation and conclude that the § 0.57 delegation includes the authority to move to transfer a juvenile for prosecution as an adult.

■ The second prong of Ward's delegation argument is that since the regulation does not authorize *Deputy* Assistant Attorneys General to redelegate their authority to United States Attorneys, the motion to

---

**20.** *See* note 12, *supra.*

**21.** As with the murder charges, both Todd and Parker may be subject to a retrial on the robbery charge. *See* note 11, *supra.*

transfer Ward, made by a United States Attorney acting under authority of a letter from a Deputy Assistant Attorney General,[22] was unauthorized. The government's response is that there was no delegation; the Deputy made a determination to proceed against Ward as an adult and merely authorized the United States Attorney to file the appropriate motion. Eighteen U.S.C. § 5032 and 28 C.F.R. § 0.57 make it clear, however, that a motion for transfer must be "of the Attorney General" or an appropriate delegate. Here, the motion was made by one not technically appropriately delegated. Nevertheless, since it here appears that the *decision* to file the motion for transfer was made by an authorized person, the technical failure in filing is not fatal to jurisdiction.[23]

### B. *Corroboration of Ward's statement by independent evidence.*

■ Ward next argues that the district court erred in denying his motion for a directed verdict of acquittal on the robbery and the felony murder counts. He contends that there is insufficient corroborative evidence of the crime of robbery, independent of his statement, to support a conviction on that count.

In *Wong Sun v. United States*, the Supreme Court said: "It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused." 371 U.S. 471, 488–489, 83 S.Ct. 407,

418, 9 L.Ed.2d 441 (1963) (footnote omitted). The Court noted:

> Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. * * * There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it.

*Id.* at 490 n.15, 83 S.Ct. at 418.

Ward contends that this body of law compels his acquittal on the robbery and related felony murder counts because, absent his confession, there is no evidence indicating that Williams either had or lost money on the night in question. We have, however, examined the record and are satisfied that there is sufficient corroborative evidence of the robbery.

### C. *The location of the killing.*

■ We have noted earlier that under 18 U.S.C. § 3236, the offense of murder shall be deemed to be committed "where the injury was inflicted" or "where other means [were] employed which caused the death," not where the death occurred. Ward contends, quite simply, that the evidence was insufficient for the jury to find beyond a reasonable doubt that the cause of Williams' death was the cold weather. To the

---

**22.** The letter from Deputy Assistant Attorney General Robert L. Keuch to United States Attorney Ronald S. Reed, Jr., reads, in pertinent part, as follows:

> This is in response to your request to move the court to transfer the proceedings against [Melvin Ward] to adult prosecution. Pursuant to the authority delegated to me by the Attorney General in 28 C.F.R. § 0.57, you are hereby authorized and directed to move the court to transfer the proceedings against Melvin Ward to adult prosecution * * *.

**23.** Ward analogizes his case to that of *United States v. Giordano*, 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). There, the Supreme Court upheld the suppression of certain evi-

dence obtained by wire interceptions that were not authorized by the statutorily designated officials under 18 U.S.C. § 2515. The questioned wiretaps were ordered on applications authorized not by the Attorney General but by his Executive Assistant. We think that there are at least two significant distinctions between *Giordano* and the case now before us. First, in *Giordano*, the purported authorization came from one clearly unauthorized to pass judgment on the applications; here, the authorization came from one who was qualified to make the decision called for. Secondly, the statute in *Giordano* explicitly proscribed delegation; here, it does not. *See United States v. Cuomo*, 525 F.2d 1285, 1287–1288 (5th Cir. 1976).

contrary, he contends that the evidence suggested beyond a reasonable doubt that the blow (inflicted at Birdland) was the cause of the death.

Ward's statement, however, established that Williams' legs were moving and that he was mumbling when taken from the car to be left in the woods. Ward thus conceded that Williams survived the car ride from Birdland to the woods, a ride of from about ten to thirty minutes. On the basis of that evidence, the government asked its expert witness, Dr. Rappe, what the effect of abandonment in the subfreezing January temperatures would be on Williams. It was Dr. Rappe's opinion that if Williams survived ten minutes, and especially if he survived thirty minutes, then "he could have stayed in a coma for quite a while, hours even days before he died, except that in that weather, he would have froze [sic] to death, you know, in a short period of time." On those facts, Dr. Rappe concluded that "beyond a reasonable doubt," the temperature would have contributed to the cause of death of Frederick Williams. This evidence is sufficient to sustain the jury's verdict.

### D. *The Miranda issue.*

Ward's final contention is that his statement was obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). A full record was made at a pretrial hearing on Ward's motion to suppress. We have examined this record and Ward's allegations and are satisfied that his *Miranda* rights were not breached.

The convictions of Todd and Parker on all three counts are reversed. The convictions of Ward on all three counts are affirmed.

ROSS, Circuit Judge, dissenting:

I dissent from the opinion of the majority in this appeal.

In my view, the plurality opinion in *Parker v. Randolph*, 442 U.S. 62, 99 S.Ct. 2132, 60 L.Ed.2d 713 (1979) establishes the proper rule for the handling of sixth amendment issues in the context of interlocking confessions. As pointed out in that opinion, *Bruton v. United States*, 391 U.S. 123, 88 S.Ct.

1620, 20 L.Ed.2d 476 (1968) recognized that a limiting instruction does not suffice to remove the prejudicial impact of a nontestifying codefendant's confession where the defendant has maintained his innocence from the beginning of the proceedings. Under those circumstances, the confession of the codefendant is submitted to the jury without affording the defendant his constitutional right of cross examination. In a situation where all of the defendants have admitted their guilt, however, "the incriminating statements of a codefendant will seldom, if ever, be of the 'devastating' character referred to in *Bruton* * * *." *Parker v. Randolph, supra,* 442 U.S. at 73, 99 S.Ct. at 2139, 60 L.Ed.2d at 723. Therefore, I agree with the plurality in *Parker* that the admission of interlocking confessions with proper limiting instructions is sufficient to satisfy the requirements of the sixth and fourteenth amendments.