UNITED STATES of America, Appellee,

v.

Anthony Myron IRON THUNDER, Appellant.

UNITED STATES of America, Appellee,

v.

Richard Lee HANLEY, Appellant.

Nos. 82–2330, 82–2351.

United States Court of Appeals, Eighth Circuit.

Submitted May 18, 1983.

Decided July 29, 1983.

Thomas M. Tobin, Maynes, Tonner, Maynes & Tobin, Aberdeen, S.D., for Hanley.

Ronald J. Hall, Siegel, Barnett & Schutz, Aberdeen, S.D., for Iron Thunder.

Philip N. Hogen, U.S. Atty., Raymond P. Murley, Asst. U.S. Atty., Sioux Falls, S.D., for appellee.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

HEANEY, Circuit Judge.

Anthony Myron Iron Thunder and Richard Lee Hanley were tried jointly for conduct occurring in the early morning hours of May 7, 1982. A jury found Hanley guilty of assault with the intent to commit rape within Indian country, in violation of 18 U.S.C. §§ 113(a) & 1153 (1976), and Iron Thunder guilty of rape within Indian country, in violation of 18 U.S.C. §§ 1153 & 2031 (1976). The court sentenced each defendant to five years imprisonment. Iron Thunder and Hanley both appeal their convictions raising substantially identical issues. Because we agree that the district court committed prejudicial error in refusing to sever their trials while admitting into evidence the pretrial statements of each defendant which incriminated the other, we reverse.

## I. FACTS

In the early evening of Thursday, May 6, 1982, a drinking party began at the residence of defendant Iron Thunder and his wife in Aberdeen, South Dakota. Dana Traversie, a friend of the Iron Thunders, her boyfriend, Jerris Oka, and defendants Iron Thunder and Hanley attended the gathering which continued through the night. Sometime in the early morning hours of May 7, 1982, several of those at the party decided to drive from Aberdeen to Wakpala, South Dakota, on the Standing Rock Indian Reservation, where relatives of the Iron Thunders and Hanley lived. Iron Thunder drove with his wife Colleen, her infant son, and Hanley in the front seat of the car. Traversie, Oka, and Mary Ann Mitchell sat in the rear. Iron Thunder, Hanley, and others in the car continued to drink alcoholic beverages during the drive. Traversie fell asleep or passed out in the back seat of the car during the trip. On arriving in Wakpala, the group left Colleen Iron Thunder, her son, and Mary Ann Mitchell at the residence of Tim DeMarris, Colleen's brother-in-law. The rest of the group continued on to the residence of Hanley's mother just outside of Wakpala.

Once at the Hanley residence, the government contends that Iron Thunder and Hanley carried Traversie into a bedroom in the house and that both raped her. Shortly after the alleged rapes, Oka walked with Traversie to his mother's residence in Wakpala. Oka told his mother of Traversie's encounters with the defendants, and his mother called Kenneth Marshall, a Bureau of Indian Affairs employee, at approximately 9:00 a.m. Marshall advised that Traversie go to Fort Yates Public Health Service Hospital in North Dakota for an examination. He also searched the Hanley residence, finding certain articles of Traversie's clothing in a bedroom. Traversie went to the hospital that same day and was examined by Dr. John Riter Hess.

Dr. Hess followed a standardized protocol in examining Traversie. He found scratches on Traversie's wrists and small lacerations posterior to her vagina. Although vaginal fluid samples taken from Traversie and examined at the Fort Yates facility did not reveal the presence of sperm, Dr. Hess testified at trial that other samples examined at a pathology laboratory in Bismarck, North Dakota, revealed some sperm and evidence of recent sexual contact.

On June 7, 1982, Special Agent H. Adrian Mohr interviewed Iron Thunder. Mohr told Iron Thunder that he was a suspect in the rape of Dana Traversie and read Iron Thunder a document advising him of his constitutional rights to remain silent and to be represented by an attorney during questioning. Iron Thunder signed a form waiving those rights and agreed to talk to Mohr. In his statement, Iron Thunder denied having sexual intercourse with Traversie. He indicated, however, that Traversie claimed that Hanley had raped her after Iron Thunder left them alone in the bedroom on May 7, 1982. After making his statement, Iron Thunder agreed to appear for a polygraph examination at a future date.

On June 10, 1982, Mohr interviewed Hanley. Mohr advised Hanley of his rights in the same manner used with Iron Thunder. Hanley likewise signed a form waiving those rights. Hanley told Mohr that he and Iron Thunder carried Dana Traversie into the Hanley residence in Wakpala on May 7, 1982. Hanley admitted that the defendants undressed her in the bedroom of that residence. He stated that he then left the room and that after a while Iron Thunder came out of the bedroom smiling. Hanley also agreed to submit to a polygraph examination in the future.

At approximately 10:00 a.m., on June 22, 1982, Hanley appeared at the FBI office in Aberdeen for his polygraph examination. Special Agent Edmund Diem, from Minneapolis, Minnesota, was present to conduct the examination with Mohr. Hanley signed another waiver of his constitutional rights and a "Consent to Interview with Polygraph" form. During this examination, Hanley admitted that he attempted to have sexual intercourse with Traversie, but denied having penetrated her vagina. When Diem told Hanley that his polygraph results evinced some deception, Hanley revised his statement to include that he manipulated her vagina with his fingers during his attempt to have intercourse with her.

Iron Thunder arrived for his polygraph examination soon after Hanley completed his interview on June 22, 1982. Iron Thunder apparently became aware that Hanley had previously submitted to a polygraph examination and Iron Thunder was under the impression that Hanley had "passed" the test. Special Agent Diem had Iron Thunder execute both the waiver of rights and consent to interview with polygraph forms. Prior to the administration of the polygraph test, Iron Thunder made a statement to Diem in which he admitted that he and Hanley carried Traversie into the Hanley residence and that he had sexual intercourse with her. He also stated that Hanley at least tried to have sexual relations with Traversie and that she came from the bedroom crying after being alone in the room with Hanley.

II. DISCUSSION

A. Violation of Right to Cross-Examine Adverse Witnesses

Iron Thunder and Hanley first allege that the district court's refusal to sever their trials and its subsequent admission of the pretrial statements of each nontestifying defendant which incriminated the other violated their rights to effective cross-examination of adverse witnesses protected by the sixth amendment to the United States Constitution. *Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 1622, 20 L.Ed.2d 476 (1968). The government contends that the *Bruton* rule does not apply in this case because the defendants gave "interlocking confessions," allowing the admission of their statements in a joint trial with a jury instruction limiting consideration of each statement to the confessing defendant. *Parker v. Randolph,* 442 U.S. 62, 74–75, 99 S.Ct. 2132, 2139–2140, 60 L.Ed.2d 713 (1979) (Rehnquist, J., announcing the judgment of the Court).

The sixth amendment provides that in "all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." The right to confrontation secured by this amendment includes the right of the accused in a criminal prosecution to cross-examine witnesses testifying on behalf of the government. *Bruton v. United States, supra,* 391 U.S. at 126, 88 S.Ct. at 1622. This

right to cross-examination is violated when the out-of-court statement of a nontestifying codefendant which incriminates another defendant is admitted into evidence in a joint trial. In such a situation, the defendant is deprived of the opportunity to cross-examine the codefendant/declarant, and a jury instruction to limit consideration of the statement to its declarant is insufficient to remedy this deprivation. *Id.* at 126, 135–137, 88 S.Ct. at 1622, 1627–1628.

▮ The Supreme Court examined this sixth amendment right, in the context of the admission of pretrial confessions by several defendants in a joint trial, in the case of *Parker v. Randolph, supra.* When a defendant who has confessed complains about the admission of a codefendant's confession, the confessions might interlock as to all evidence which the jury might consider from each of them. In *Parker v. Randolph,* a four-member plurality of the Court stated that the admission of such "interlocking confessions," with instructions to the jury limiting the use of each confession to the defendant who made that statement, did not violate the sixth amendment even though the defendants refused to testify at trial. *Id.* at 74–75, 99 S.Ct. at 2139–2140. The rationale behind this approach is that a defendant who has admitted criminal liability is not seriously harmed by her or his inability to cross-examine the out-of-court statement of a codefendant merely corroborating that admission. *Id.* at 72–75, 99 S.Ct. at 2138–2140.

Justice Blackmun concurred in the result in *Parker v. Randolph,* but on the basis that

sions in that case was "harmless beyond a reasonable doubt" rather than on the basis of the *per se* approach adopted by the plurality. *Id.* at 77, 99 S.Ct. at 2141 (Blackmun, J., concurring in part and concurring in the judgment). The harmless error rule had firmly been established by the Supreme Court in previous cases concerning the erroneous admission of a nontestifying codefendant's out-of-court statement in a joint criminal prosecution. *See Schneble v. Florida,* 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972); *Harrington v. California,* 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969).

▮ In the instant case, the district court denied both defendants' motions for trial severance. In addition, both defendants exercised their fifth amendment rights not to testify at the joint trial. At trial, the court allowed Special Agent Mohr to testify as to substantially all facts contained in the statements made by Iron Thunder and Hanley in the interviews of June 7, 10, and 22, 1982.[1]

Mohr testified before the jury that on June 7, 1982, Iron Thunder made the following statement concerning the events of May 7, 1982:

> Dana Traversie got out [of the car] with Richard [Hanley] and Myron [Iron Thunder]. According to Myron Iron Thunder she walked into the house with them. She entered the bedroom of the house with Richard Hanley. He [Iron Thunder] then laid down on the couch and went to sleep. Stated that a short time later Dana Traversie woke him up on the

---

1. The district court did partially grant Iron Thunder's motion to redact portions of Hanley's out-of-court statements. The court's redactions, however, were based primarily on minor discrepancies between Hanley's June 10, 1982, statement and his subsequent statements at the polygraph examination conducted on June 22, 1982. The redactions reflected the court's concerns regarding the voluntariness of Hanley's statements made during and after the June 22 polygraph test. Although the redaction of inadmissible evidence from an otherwise admissible statement may avoid error in some cases, the interview statements which the court actually admitted in this case covered most of the relevant content of the redacted evidence. *Cf. Parker v. Randolph,* 442 U.S. 62, 67 n. 3, 99 S.Ct. 2132, 2136 n. 3, 60 L.Ed.2d 713 (1979) (codefendants' confessions redacted to disguise the names of the persons mentioned, but the content of those confessions made the identities of all parties obvious). Moreover, those admitted statements are the bases for the defendants' allegations of reversible error regardless whether the redacted evidence was properly excluded.

couch, said she was crying she said that Richard Hanley had raped her.

Tr. at 284.

Mohr also testified that Hanley made the following statement on June 10, 1982:

Iron Thunder drove the car to his [Hanley's] mother's. Iron Thunder and Hanley then went in the house and met with Robert Hanley. They decided then to bring Dana into the house. They went back out to the vehicle and they physically carried Dana Traversie into the residence and into the bedroom of the residence. Mr. Hanley advised then that he left Myron Iron Thunder and Dana. Traversie in the bedroom alone. That he had come out of the bedroom and met with his brother. A short time later he advised he observed Myron Iron Thunder come out of the bedroom with a smile on his face. He [Hanley] then went to the bedroom, observed Dana Traversie lying on the bed nude and crying at this time.

Tr. at 316–317.

Finally, Mohr testified that Hanley made the following statement at the interview on June 22, 1982:

Mr. Hanley stated that he and Myron Iron Thunder undressed Dana Traversie and that Myron Iron Thunder got on top of Dana Traversie. Mr. Hanley advised that he watched for a period of time and then he departed the bedroom. He walked outside of the bedroom and he met with Robert [Hanley] and they had a cup of coffee. * * * They had a cup of coffee and at this particular time they could hear the bed striking the wall coming from the bedroom where Mr. Hanley had left Iron Thunder and Dana Traversie.

Tr. at 318.

The admission of these statements, combined with the defendants' constitutional choices not to testify, violated their sixth amendment rights to effective cross-examination and requires reversal of both convictions.

A harmless error inquiry is required in this case even under the *per se* approach adopted by the *Parker v. Randolph* plurality

of the Supreme Court. The *per se* admissibility doctrine only applies to a case of "interlocking confessions." *Parker v. Randolph, supra,* 442 U.S. at 75, 99 S.Ct. at 2140. In *Parker v. Randolph,* the complaining defendants had each made out-of-court statements incriminating themselves as to the crucial facts underlying their felony murder convictions: time, place, felonious conduct, and individual awareness of the felony scheme. *Id.* at 67–68, 99 S.Ct. at 2136–2137. In contrast, although both Iron Thunder and Hanley admitted that they committed the physical acts necessary to find rape or assault with the intent to commit rape, both defendants denied that these acts were performed without Traversie's consent. The defendants' failures to admit lack of consent demonstrate that neither "confessed" to criminal conduct as did the defendants in *Parker v. Randolph.* Thus, unless the erroneous admission of these statements is found harmless beyond a reasonable doubt, even the *Parker v. Randolph* plurality would reverse the convictions of Iron Thunder and Hanley. *See id.* at 72, 99 S.Ct. at 2138 ("The prejudicial impact of a codefendant's confession upon an incriminated defendant who has, insofar as the jury is concerned, maintained his innocence from the beginning is simply too great in such cases to be cured by a limiting instruction.").

■ We cannot dismiss the court's error in admitting the defendants' statements without trial severance as harmless beyond a reasonable doubt. Hanley's statements, presented to the jury through the testimony of Special Agent Mohr, indicated that Iron Thunder not only had sexual intercourse with Traversie, but that Iron Thunder left the bedroom smiling after completing the act, even though Traversie remained in the room crying, and that Hanley and his brother heard the bed striking the wall in the room where Iron Thunder was alone with Traversie. These statements were extremely damaging to Iron Thunder's defense of consent. Because the other evidence of consent or the lack thereof was not

conclusive in this case, these statements certainly could have decided the issue in the mind of the jury against Iron Thunder, in spite of the district court's instruction that the jury consider each defendant's pretrial statements only against the declaring defendant.

Even more damaging was Mohr's testimony regarding Iron Thunder's statement of Hanley's culpability. Iron Thunder's statement indicated not only that Traversie came out of the bedroom crying after being alone with Hanley, but that "she said that Richard Hanley had raped her." This statement would be harmful to Hanley even if the government's case against him were otherwise strong. The government's case on the issue of consent was by no means overwhelming, however, so Iron Thunder's statement was most likely devastating to Hanley's defense. Thus, the *Bruton* error as to both Iron Thunder and Hanley cannot be dismissed as harmless beyond a reasonable doubt and we must reverse both convictions because of this error.

■ As an alternative basis for our holding, we would find reversible *Bruton* error even if the defendants' pretrial statements in this case were "interlocking confessions." In *United States v. Parker,* 622 F.2d 298, 301 (8th Cir.), *cert. denied,* 449 U.S. 851, 101 S.Ct. 143, 66 L.Ed.2d 63 (1980), we adopted the harmless error analysis recognized in Justice Blackmun's concurrence in *Parker v. Randolph* rather than the *per se* admissibility rule of the plurality. The harmless error rule protects more completely the rights secured by the sixth amendment while allowing an appellate court to affirm a criminal conviction where the trial error did not subject the complaining defendant "to a substantial risk of incurable prejudice." *United States v. Walton,* 538 F.2d 1348, 1353 (8th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 647, 50 L.Ed.2d 628 (1976). *See also United States v. Fountain,* 449 F.2d 629, 633 (8th Cir.1971), *cert. denied,* 405 U.S.

929, 92 S.Ct. 981, 30 L.Ed.2d 802 (1972). Because we have found that the *Bruton* error in this case was not harmless under this standard, we would also reverse under Justice Blackmun's harmless error approach to the "interlocking confessions" problem.

### B. Defendants' Remaining Allegations of Trial Error

■ Iron Thunder and Hanley assert that their statements to Agents Mohr and Diem were not made "freely and voluntarily," in violation of the defendants' fifth and sixth amendment rights to remain silent and to the effective assistance of counsel.[2] In light of our recent decision in *Fields v. Wyrick,* 706 F.2d 879, at 880–881 (8th Cir. 1983), on remand from the Supreme Court, *Wyrick v. Fields,* —— U.S. ——, 103 S.Ct. 394, 74 L.Ed.2d 214 (1982), we are constrained to find that the use of the polygraph examination in Hanley's case and the threat of such an examination in Iron Thunder's case did not in and of themselves infringe on the defendants' constitutional rights. The investigating agents advised the defendants prior to each interview of their rights to the assistance of an attorney and to discontinue the interviews at any time. Both defendants signed waivers of those rights before making any statements to the agents. Furthermore, both defendants signed forms consenting to polygraph examinations prior to their statements on June 22, 1982. Thus, unless the defendants' waivers were not voluntary, knowing, and intelligent, they cannot now complain that the agents elicited statements from them in violation of their constitutional rights to remain silent and to the assistance of counsel. *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981) (improper waiver after invoking fifth amendment right to counsel); *Jackson v. Denno,* 378 U.S. 368, 376–377, 84 S.Ct. 1774, 1780–1781, 12 L.Ed.2d 908 (1964) (use at

**2.** The government does not dispute the defendants' assumption that their fifth and sixth amendment rights to remain silent and to the assistance of counsel were triggered under the circumstances of the pretrial interviews conducted in this case. Because we find that the defendants properly waived whatever rights they in fact possessed in this regard, we need not decide whether this assumption was correct.

trial of statement made after improper waiver violated due process protection in fourteenth amendment).

■ The district court conducted a pre-trial hearing considering the voluntariness of all out-of-court statements made by Iron Thunder and Hanley. The court made express findings to the effect that both defendants made their statements voluntarily, that both knew the nature of the crimes being investigated, that both knew they could refuse to make any statements, and that both understood that they could obtain the assistance of legal counsel prior to making any statements. See 18 U.S.C. § 3501(b) (1976) (circumstances court must consider in voluntariness hearing). These factual findings were legally sufficient to hold that the defendants' waivers were voluntary, knowing, and intelligent, and the findings are not clearly erroneous. Therefore, we hold that the court did not err in admitting the statements made by Iron Thunder and Hanley insofar as the defendants' rights to remain silent and to the assistance of counsel are concerned.

■ Iron Thunder and Hanley also contend that the government improperly elicited a remark at trial from Agent Diem regarding his status as a polygraph examiner. The defendants assert that the jury naturally would infer from this remark that Diem's testimony reflected the results of polygraph examinations of the defendants and would give more weight to that testimony. Cf. United States v. Gordon, 688 F.2d 42, 44–45 (8th Cir.1982); United States v. Alexander, 526 F.2d 161, 166 (8th Cir. 1975) (polygraph test results generally not admitted absent stipulation among parties). We disagree. Diem's remark concerning the polygraph occurred during the following preliminary questioning by the government:

Q: [By government] Your employment?

A: [Diem] I'm with the FBI.

Q: Employed at what?

A: I am a polygraph examiner.

Q: Are you a Special Agent of the FBI?

A: Yes, sir.

Tr. at 288–289.

This isolated reference to Diem's polygraph specialty did not overshadow the remaining bulk of his testimony concerning "visits" and "interviews" with the defendants. Moreover, if the court instructed the jury to disregard Diem's polygraph remark, it would most likely draw the jury's attention directly to the fact which the defendants now complain should not have been considered. Under these circumstances, we find no error in the court's failure to instruct the jury not to consider Diem's status as a polygraph examiner.

■ Iron Thunder and Hanley further contend that Dr. Hess's testimony regarding Traversie's statements during the examination at the Fort Yates hospital to the effect that she had been raped was hearsay improperly admitted at trial. The government asserts that Hess's testimony is excepted from the hearsay rule under Fed.R. Evid. 803(4) which authorizes admission into evidence of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." Given the circumstances and content of the statements made by Traversie to Dr. Hess, we agree that this Rule 803(4) exception prevents our finding any abuse of discretion in the trial court's admission of Dr. Hess's testimony. See United States v. Iron Shell, 633 F.2d 77, 86 (8th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).

Even though Dr. Hess's examination and questioning of Traversie were pursuant to a standardized protocol designed in large measure to prepare for criminal prosecution, Rule 803(4) applies to statements made for the purpose of medical diagnosis as well as to statements made for the purpose of medical treatment. Id. at 83. Traversie responded to questions by Dr. Hess which were intended not only to shed light on her physical, emotional, and mental condition,

but which also could serve as a basis for treatment. Traversie's statements did not point to the persons responsible for her condition nor did they reveal facts irrelevant to medical diagnosis or treatment. *Cf. id.* at 84 (victim's statements concerned "what happened rather than who assaulted her"). That no treatment was contemplated or given does not prevent application of the Rule 803(4) exception. Traversie's responses related solely to the cause of her present condition, were relevant in diagnosing that condition, and thus were within the scope of admissible hearsay described in Rule 803(4).

■ Iron Thunder and Hanley next assert that the district court erred in denying their request for a jury instruction on the lesser included offense of simple assault, as opposed to the instructions on rape and assault with the intent to commit rape which were given. The trial court carefully considered the defendants' proposed instruction regarding simple assault and decided that Traversie's consent was the only real issue in dispute in the case. The defendants' intent to have sexual intercourse with her, or at least to attempt to do so, was not in question. The court found that if there were any assault in this case, it necessarily would have been performed with the intent to commit rape. Therefore, the court held that no instruction on simple assault was required. We agree with this holding. *See id.* at 88; *United States v. Scharf,* 558 F.2d 498, 502 (8th Cir.1977).

Iron Thunder and Hanley raise several other issues to support the reversal of their convictions. We have considered each of these contentions and find no merit to them.

### III. CONCLUSION

Among the defendants' numerous allegations of trial error in this case, we find only one of substance. The court erred in admitting into evidence in the joint trial of the nontestifying defendants the pretrial statements of each defendant inculpatory of the other. Because of the substantial risk that this error harmed the defenses of both Iron Thunder and Hanley, we reverse their con-

victions without prejudice to the government's right to retry either or both of them in a procedurally and constitutionally adequate manner. *See Burks v. United States,* 437 U.S. 1, 15–16, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978).