**UNITED STATES of America**

**v.**

**Orlando PEREZ and Teddy Ramos, Defendants.**

**No. 96 Cr. 167 (RWS).**

United States District Court, S.D. New York.

Sept. 6, 1996.

Mary Jo White, United States Attorney for the Southern District of New York, New York City, for the U.S. (Alexandra A.E. Shapiro, Steven M. Cohen, and Richard B. Zabel, Assistant U.S. Attorneys, of counsel).

Michael Young, New York City, for Defendant Orlando Perez.

Morvillo, Abramowitz, Grand, Iason & Silberberg, New York City, for Defendant Teddy Ramos (Robert J. Anello and Christopher J. Gunther, of counsel).

## OPINION

SWEET, District Judge.

Defendants Teddy Ramos ("Ramos") and Orlando Perez ("Perez") have moved to dismiss the indictment against them, and for discovery. For the reasons set forth below the motion will be granted in part and denied in part.

### Prior Proceedings

The eight count indictment, S1 96 Cr. 167, handed down on March 29, 1996, charges Perez with participating in and conspiring to participate in a racketeering enterprise, the Almighty Latin King Queen Nation (the "Latin Kings"), through a pattern of racketeering activity, in violation of Title 18, United States Code, Sections 1961 and 1962(c) and (d) ("RICO"). Ramos is jointly charged in Counts Three, Four, and Seven of the indictment. Count One of the indictment charges Perez with a substantive RICO violation predicated on the murder of Benjamin Quinones ("Quinones") and attempted murder of Michael Irizarry ("Irizarry"); Count Two charges Perez with a RICO conspiracy violation grounded on those same acts; Count Three charges Perez and Ramos with conspiring to murder Quinones in violation of 18 U.S.C. Section 1959 ("Section 1959") (a)(5); Count Four charges both defendants with the murder of Quinones in violation of Section 1959(a)(1); Count Five charges Perez with conspiracy to murder Irizarry; Count Six charges Perez with an attempt to murder Irizarry; Count Seven charges Perez and Ramos with using a firearm during the Quinones murder in violation of 18 U.S.C. Section 924(c); Count Eight charges that Perez used a firearm during the attempt to murder Irizarry.

On June 13, 1996, Ramos moved (1) to dismiss Counts Three, Four and Seven of the indictment on the grounds that the enactment of Section 1959 exceeded Congress' authority to regulate interstate commerce; (2) pursuant to Fed.R.Crim.P. 18 to dismiss those counts for improper venue; (3) pursuant to Fed.R.Crim.P. 14 to sever those counts; (4) pursuant to Fed.R.Crim.P. 12(b)(3) to suppress Ramos' post-arrest statement, or seeking a hearing regarding the circumstances under which the statement was made; (5) pursuant to Fed.R.Crim.P. 7(f) to compel the government to provide a bill of particulars; and (6) to compel the government to provide immediate access to *Brady* and *Giglio* material, to provide a list of government witnesses, and to disclose evidence of other crimes pursuant to Fed. R.Evid. 404(b).

On June 13, 1996, Perez moved: (1) to suppress his post-arrest statements on the ground that they were obtained in violation of the Fifth and Sixth Amendment; (2) to suppress the fruits of the government's search of Perez's father's apartment on the grounds that the search was conducted in violation of the Fourth Amendment; (3) to suppress tape recordings of telephone conversations between Perez and various inmates of the Metropolitan Correction Center ("MCC") on the grounds that the interception violated the Fourth, Fifth and Sixth Amendments; (4) to preclude the government from introducing Perez's prior record at trial; and (5) to compel the government to provide Perez with discovery and particulars concerning the charges.

Oral argument on Perez and Ramos' motions was heard on June 25, 1996. Later submissions were made by Defendants on August 19, 1996 and August 23, 1996, at which time the motions were considered fully submitted.

*Discussion*

### I. *Ramos' Motion to Dismiss Counts Three, Four and Seven Based on United States v. Lopez Will Be Denied*

Ramos argues that the Supreme Court's opinion in *United States v. Lopez,* —— U.S. ——, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), requires dismissal of the 1959 Counts—*i.e.,* Counts Three and Four of the indictment, charging violations of Section 1959, and Count Seven, charging the use and carrying of a firearm during and in relation to a crime of violence. Ramos argues that, under *Lopez,* Congress' enactment of Section 1959 exceeded its power to legislate under the Commerce Clause.

### A. *The Commerce Clause and the Lopez Holding*

To protect interstate commerce, the Commerce Clause empowers Congress to regulate three broad categories of conduct. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629. First, Congress is empowered to regulate the use of the channels of interstate commerce. *Id.,* at ——, 115 S.Ct. at 1629 (citing *Perez v. United States,* 402 U.S. 146, 150, 91 S.Ct. 1357, 1359–60, 28 L.Ed.2d 686 (1971); *United States v. Darby,* 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609 (1941)). Second, Congress is empowered to "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1629 (citing *Perez,* 402 U.S. at 150, 91 S.Ct. at 1359–60). Under this second category, Congress may prohibit direct interference with persons and things in interstate commerce. Third, Congress is empowered to regulate or prohibit "activities that substantially affect interstate commerce." *Lopez,* —— U.S. at ——, 115 S.Ct. at 1630 (citing *National Labor Relations Board v. Jones & Laughlin Steel,* 301 U.S. 1, 37, 57 S.Ct. 615, 624, 81 L.Ed. 893; *Maryland v. Wirtz,* 392 U.S. 183, 196 n. 27, 88 S.Ct. 2017, 2024 n. 27, 20 L.Ed.2d 1020 (1968)).

According to the *Lopez* Court, the "substantial effect" requirement of the third category can be met in two ways. First, acts "regulating intrastate economic activity" have been upheld based on the conclusion that "the activity substantially affected interstate commerce." —— U.S. at ——, 115 S.Ct. at 1630. Second, *Lopez* instructed that, apart from economic regulation, the "substantial effects" test is met by criminal statutes that include a "jurisdictional element which would ensure, through case-by-case inquiry, that the [prohibited act] in question affects interstate commerce." *Id.* at ——, 115 S.Ct. at 1631.

In determining whether a federal statute may be upheld as a proper exercise of Congress' power to regulate interstate commerce, courts "must defer to a congressional finding that a regulated activity affects interstate commerce 'if there is any rational basis for such a finding,' *Hodel v. Virginia Surface Mining,* 452 U.S. 264, 276 [101 S.Ct. 2352, 2360, 69 L.Ed.2d 1] (1981), and ... the means selected by Congress are 'reasonably adapted to the end permitted by the Constitution,'" *Preseault v. Interstate Commerce Commission,* 494 U.S. 1, 17, 110 S.Ct. 914, 924–25, 108 L.Ed.2d 1 (1990) (quoting *Heart of Atlanta Motel v. United States,* 379 U.S. 241, 262, 85 S.Ct. 348, 360, 13 L.Ed.2d 258 (1964)); *accord Hodel v. Virginia Surface Mining,* 452 U.S. at 276, 101 S.Ct. at 2360. Courts should look to statutory findings, as well as congressional committee findings, to assess the rationality of Congress' conclusions. *Lopez,* —— U.S. at ——, 115 S.Ct. at 1631–1632; *Katzenbach v. McClung,* 379 U.S. 294, 299, 304, 85 S.Ct. 377, 381, 383–84, 13 L.Ed.2d 290 (1964); *Perez,* 402 U.S. at 156–57, 91 S.Ct. at 1362–63. Once the court "find[s] that the legislators, in light of the facts and testimony before them, have a rational basis for finding a chosen regulatory scheme necessary to the protection of commerce, [its] investigation is at an end." *Katzenbach,* 379 U.S. at 303–04, 85 S.Ct. at 383–84 (cited with approval in *Hodel v. Virginia Surface Mining,* 452 U.S. at 276, 101 S.Ct. at 2360).

In *Lopez,* the Supreme Court held that 18 U.S.C. Section 922(q), which prohibited possession of a firearm in a school zone, violated the Commerce Clause because the prohibited

activity did not, even when viewed in the aggregate, substantially affect commerce.

Section 922(q) is a criminal statute that by its terms has nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define terms. Section 922(q) is not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated. It cannot, therefore, be sustained under our cases upholding regulations that arise out of or are connected with a commercial transaction, which viewed in the aggregate, substantially affects interstate commerce.

*Lopez* at —, 115 S.Ct. at 1630–31.

Section 1959, the statute at issue here, is distinguishable from the statute at issue in *Lopez.* Section 1959, provides, in pertinent part:

(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished [in accordance with the specific crime].

(b) As used in this section . . .

(2) "enterprise includes any partnership, corporation, association, or other legal entity, any union or group of individuals associated in fact although not a legal entity, which is engaged in or the activities of which affect, interstate or foreign commerce.

Unlike the statute struck down in *Lopez,* Section 1959 is a criminal statute that by its terms addresses interstate commerce and economic enterprises. As evidenced by the plain language of the statute, in enacting Section 1959, Congress sought to regulate entities that "engaged in, or the activities of

which affect, interstate or foreign commerce." 18 U.S.C. § 1959.

Additionally, Section 1959 was enacted to complement RICO, which itself explicitly addresses interstate commerce.

Section 1959 . . . was enacted to complement RICO, . . . [t]hus Section 1959 complements RICO by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute under Section 1959 for violent crimes intended, *inter alia,* to permit the defendant to maintain or increase his position in a RICO enterprise.

*United States v. Concepcion,* 983 F.2d 369, 380 (2d Cir.1992), *cert. denied,* 510 U.S. 856, 114 S.Ct. 163, 126 L.Ed.2d 124 (1993).

In enacting RICO, Congress stated its view with respect to that statute's relation to interstate commerce:

[O]rganized crime in the United States . . . drains billions of dollars from America's economy by unlawful conduct and the illegal use of force. . . . [O]rganized crime activities in the United States weaken the stability of the Nation's economic system . . . [and] seriously burden interstate and foreign commerce.

Congressional Statement and Finding of Purpose, Organized Crime Control Act, Pub.L. No. 91–452, 84 Stat. 922, 922–23 (1970); *see generally* Gurule, *Complex Criminal Litigation: Prosecuting Drug Enterprises and Organized Crime,* at 49–52 (1986) (hereinafter "Gurule") (reviewing legislative history of RICO and demonstrating that Congress found that organized crime drains billions of dollars from the economy and undermines the nation's economic system).

Similarly, the Senate Judiciary Committee report on Section 1959's prohibition of violent crimes in aid of racketeering expressly stated the rationale behind federal jurisdiction in such cases:

[T]he Committee concluded that the need for Federal jurisdiction is clear, in view of the Federal Government's strong interest, as recognized in existing statutes, in sup-

pressing the activities of organized criminal enterprises, and the fact that the FBI's experience and network of informants and intelligence with respect to such enterprises will often facilitate a successful Federal investigation where local authorities might be stymied.

S.Rep. No. 225, 98th Cong., 2d Sess. 305, reprinted in 1984 U.S.C.C.A.N. 3182, 3484.

■ The legislative history behind RICO, along with the legislative history and plain language of Section 1959, demonstrates that Congress found that the class of activities regulated by RICO and Section 1959 substantially affect interstate commerce. Congress rationally found that, in the aggregate, racketeering enterprises and their attendant murder, robbery, extortion, repeated nationwide, substantially affect interstate commerce. Under the authorities cited above, Congress' finding necessarily terminates judicial inquiry into whether the forbidden activities affect interstate commerce.

Ramos' contention—that the violent acts criminalized by Section 1959 do not have a substantial effect on interstate commerce—fails to recognize that Section 1959, like RICO, is not primarily directed at the activities of the individual perpetrator; instead, both Section 1959 and RICO are efforts to regulate and hinder enterprises engaged in racketeering activity. As one commentator has noted, the "passage of RICO represented the realization that in order to wage a successful assault on traditional organized crime, the focus needed to shift away from individual prosecutions to dismantling organizational foundations.... Under RICO, emphasis is placed on 'enterprise criminality' as the central focus of criminal prosecution.... The dismantlement of the criminal organization is the ultimate objective of RICO." Gurule at 50–51. Congress' efforts to regulate such entities fall within the scope of the Commerce Clause.

In *United States v. Torres*, 1995 WL 459247 (S.D.N.Y. Aug. 2, 1995), the District Court concluded that Section 1959, as well as RICO, "unequivocally prohibit conduct that 'substantially affects interstate commerce.'" *Id.* at *2. Ramos contends that the holding in *Torres* was erroneous because of that Court's reliance on *Concepcion* for the proposition that Congress may regulate violence in racketeering Section 1959 under the Commerce Clause. Ramos maintains that the Second Circuit's pre-*Lopez* decision in *Concepcion* in no way addresses congressional authority under the Commerce Clause.

A close reading of *Concepcion*, however, demonstrates that the Second Circuit did address the question whether Congress may regulate violence in racketeering Section 1959 under the Commerce Clause. The *Concepcion* Court held that the passage of Section 1959 was an express effort to complement RICO and achieve the goals of RICO, and that Section 1959 allows for Congress to regulate violence, "by allowing the government not only to prosecute under RICO for conduct that constitutes a pattern of racketeering activity in connection with an enterprise, but also to prosecute under Section 1959 for violent crimes intended, *inter alia*, to permit the defendant to maintain or increase his position in a RICO enterprise." *United States v. Concepcion*, 983 F.2d at 380–81.

Additionally, Section 1959 contains a jurisdictional element which will ensure, through case-by-case inquiry, that the offense in question affects interstate commerce. Accordingly, Section 1959 meets the "jurisdictional element" test, laid out in *Lopez*, for establishing that regulated activity "substantially affects" interstate commerce. Specifically, Section 1959 prohibits the commission of a violent crime "as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity" and specifies that the "enterprise" must be "engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(a) & (b)(2).

Ramos maintains that the jurisdictional element contained in Section 1959 is inadequate because it does not require that the defendant participate in racketeering; nor must the racketeering activity itself affect interstate commerce. However, Section

1959's jurisdictional element is adequate, because it includes a nexus to interstate commerce—*i.e.*, that the enterprise for which the violent act was committed engages in or affects interstate commerce. Section 1959's language and legislative history contain express congressional findings regarding the effects upon interstate commerce of violence and illegal economic enterprises. Thus, Section 1959 contains the jurisdictional element that allows for a case-by-case inquiry as to whether the defendant's specific act has affected interstate commerce.

Accordingly, Ramos's motion to dismiss Counts Three, Four, Seven under *Lopez* will denied.

## II. *The Counts of the Indictment Charging Ramos Will Not Be Severed*

Ramos has moved pursuant to Rule 14, Fed.R.Crim.P., to sever the counts jointly charging both Ramos and Perez—Counts Three, Four, and Seven—from the counts charging Perez alone. Ramos has not challenged his joinder to Perez pursuant to Rule 8(b), Fed.R.Crim.P. Assuming, *arguendo*, that Ramos was properly joined in the indictment, the sole question facing this court is whether severance is warranted here pursuant to Fed.R.Crim.P. 14.

Perez and Ramos were both indicted for conspiring to murder and for murdering Quinones. In addition, Perez alone was indicted for the attempted murder of Irizarry. Both Perez and Ramos are alleged to be members of the Latin Kings, an organization allegedly engaged in murder, other acts of violence and narcotics trafficking. Ramos argues that severance is appropriate here because evidence otherwise inadmissible against him but admissible in a joint trial will have a prejudicial impact on his defense, thereby precluding a fair trial.

■ Rule 14, Fed.R.Crim.P., states:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a sever-

ance of defendants or provide whatever other relief justice requires.

Although courts have discretion to sever defendants, "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537, 113 S.Ct. 933, 937, 122 L.Ed.2d 317 (1993). In deciding whether to grant a defendant's motion to sever, courts must weigh the inconvenience and expense of separate trials against the prejudice to the defendant resulting from a joint trial. *See United States v. Aloi*, 449 F.Supp. 698, 740 (E.D.N.Y.1977). To warrant severance, the prejudice flowing from a joint trial must be "sufficiently severe to outweigh the judicial economy that would be realized by avoiding lengthy multiple trials." *See United States v. Panza*, 750 F.2d 1141, 1149 (2d Cir.1984).

Thus, to prevail on a severance motion, it is not enough for a defendant to show that he "may have a better chance of acquittal in [a] separate trial." *Zafiro*, 506 U.S. at 540, 113 S.Ct. at 938. *See also United States v. DeSapio*, 435 F.2d 272, 280 (2d Cir.1970); *United States v. Petrone*, 499 F.Supp. 29, 33 (S.D.N.Y.1980). A defendant must show that "he will be so severely prejudiced by a joint trial that it would in effect deny him a fair trial." *United States v. Burke*, 700 F.2d 70, 83 (2d Cir.), *cert. denied*, 464 U.S. 816, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

■ Specifically, with respect to Ramos' argument here, the fact that a defendant appears in fewer counts of an indictment than a co-defendant is not grounds for severance. *See United States v. Chang An–Lo*, 851 F.2d 547, 557 (2d Cir.1988) ("Differing levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials."). The Second Circuit "has repeatedly recognized that joint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible." *United States v. Locascio*, 6 F.3d 924, 947 (2d Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1645, 128 L.Ed.2d 365 (1994).

With respect to Ramos' assertion that a joint trial will result in the admission of prejudicial evidence otherwise inadmissible in

a trial of Ramos alone, the Second Circuit has repeatedly held that limiting instructions to the jury adequately prevent whatever prejudice may result from the introduction of such evidence at a joint trial. *See United States v. Lasanta,* 978 F.2d 1300, 1307 (2d Cir.1992) (rejecting prejudice claim where district court "repeated no less than eight times that the jury should consider the evidence separately against each defendant"); *Chang An–Lo,* 851 F.2d 547, 556 (2d Cir. 1988) (denying severance where "the evidence with respect to each of the defendants was adequately straightforward that the jury could consider it without any significant spill-over effect").

Defendant has failed to show that he would be substantially prejudiced by a joint trial. Accordingly, Defendant's motion to sever will be denied.

### III. *Venue is Proper in the Southern District of New York*

Ramos urges that venue for the Section 1959 murder, conspiracy and possession of a firearm charges against Ramos lies exclusively in the Eastern, and not the Southern District of New York. Ramos bases this argument on a combined reading of 18 U.S.C. §§ 3236 and 3237(a).

18 U.S.C. § 3236 provides, in relevant part:

In all cases of Murder or Manslaughter, the offense shall be deemed to have been committed at the place where the injury was inflicted....

18 U.S.C. § 3237(a) provides, in relevant part:

Except as otherwise provided by enactment of Congress, any offense against the United States begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed.

Ramos has been charged with violations of § 1959, which provides in pertinent part:

a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuni-

ary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of the United States, or attempts or conspires so to do, shall be punished....

18 U.S.C. § 1959(a).

Ramos asserts that, pursuant to Section 3236, venue in the Section 1959 murder charge against him, like venue in all murder charges, lies only in the district in which the injury was inflicted, in this case in the Eastern District of New York. The government concedes that, with respect to the Section 1959 charges against Ramos, the fatal injury occurred in the Eastern District of New York. Ramos argues that the offense of murder provides an exception as contemplated by the first clause of Section 3237(a). Ramos further argues that because the operative act behind each of the charges against him—murder, conspiracy to murder and use of a firearm in relation to conspiracy to murder—was the murder itself, venue for the conspiracy and firearm offenses is also proper only in the district in which the murder occurred.

The question is therefore presented whether or not the Section 1959 murder charges against Ramos constitute a continuing offense as contemplated by § 3237(a), or whether he has instead been charged with an act of murder such that Section 3236 applies. In accordance with the legislative history of Section 1959, the Second Circuit has interpreted Section 1959 as a complementary statute to RICO. *Concepcion,* 983 F.2d at 381. As set forth in Section I above, the enterprise contemplated by Section 1959 is clearly a RICO enterprise, and the murders contemplated by Section 1959 are those which occur not as single, solitary acts, but as part of the larger structure of the criminal enterprise. As the Second Circuit stated in *Concepcion,* the legislative history of Section 1959 states that one of the statute's aims was to pro-

scribe "murder and other violent crimes committed as an integral aspect of membership in [RICO] enterprises." 983 F.2d at 381.

In the instant case, the indictment charges Ramos with conspiring to murder and murdering Benjamin Quinones, both in consideration for anything of pecuniary value and for the purpose of gaining entrance to and maintaining and increasing his position in the Latin Kings. According to the indictment, therefore, Ramos's alleged murder of Quinones was intricately intertwined with his dealings with the Latin Kings, itself an alleged enterprise under RICO.

In *United States v. McCall*, the Court determined that murders committed with the object of maintaining a place in a racketeering enterprise and charged pursuant to Section 1959 constituted "continuing offenses." 915 F.2d 811, 816 (2d Cir.1990). Although the *McCall* Court made this determination in the context of deciding which Sentencing Guidelines were applicable, its interpretation of the Section 1959 murders as continuing offenses and subordinates to the RICO enterprise, rather than unitary acts, is instructive here.

■ In light of the close association between Section 1959 and RICO, the underlying Section 1959 crime—in this case, murder—is necessarily closely associated with and an integral aspect of membership in a RICO enterprise. Therefore, the Section 1959 violation constitutes a continuing offense under Section 3237(a). Accordingly, any venue appropriate for a prosecution of a continuing offense under RICO would be similarly appropriate for such a continuous

offense under Section 1959, and Section 3236 does not govern venue here.

Section 1959 is not merely a murder statute; rather, it serves as an adjunct to RICO, and governs other crimes as well as murder, such as kidnapping, assault with a dangerous weapon and maiming, when committed in connection with RICO enterprises.[1] Ramos has not simply been charged with the unitary crime of murder, rather, he has been charged with the commission, within the framework of a RICO enterprise, of a violent act designed to further his position within the Latin Kings. Therefore, even if Section 3236 provides an exception to the venue provisions of Section 3237(a) governing continuing offenses, neither murder nor manslaughter forms the sole basis of the charges against Ramos, and accordingly no such exception will be applied here.

The government contends not only that Section 1959's broad coverage of varied violent crimes in aid of a RICO enterprise renders Section 3236 inappropriate, but that Section 3236 is also inapplicable to murder charges brought under Section 1959 because Section 3236 addresses federal jurisdiction over murders, not venue. Section 3236 is a rarely-invoked clause, both in the Second Circuit and in other circuits, and hence its jurisprudence is somewhat inchoate. There is, however, some support for the government's contention that Section 3236 governs jurisdiction rather than venue.

Many of the courts that have addressed this issue have held that Section 3236 creates jurisdiction where a murder is alleged to have been committed on federal land, regardless of where the victim ultimately died.[2] In

---

1. The government cites *United States v. Vasquez–Velasco*, 15 F.3d 833, 838–41 (9th Cir.1994) and *United States v. Lopez–Alvarez*, 970 F.2d 583, 596 (9th Cir.), *cert. denied*, 506 U.S. 989, 113 S.Ct. 504, 121 L.Ed.2d 440 (1992) for the proposition that as Section 1959 jurisdiction has been upheld where the murders occurred outside the country, Section 1336 cannot govern *all* federal murder statutes, including offenses charged under Section 1959. Although the primary inquiry in those cases was the extraterritoriality of Section 1959, and not the applicability of Section 3236, the reasoning is useful; if Section 3236 indeed applied to all federal statutes involving murder, the Ninth Circuit could not have found that ei-

ther venue or jurisdiction was appropriate in those cases.

2. *See United States v. Parker*, 622 F.2d 298, 301 (8th Cir.1980) (applying Section 3236 to analyze whether jurisdiction existed to prosecute murder under Section 1111, where blow to victim's head was administered "off base, and therefore, outside of the reach of the federal government's murder statute," but victim died on military base from exposure, not blow); *United States v. Leight*, 818 F.2d 1297, 1305 (7th Cir.1987) (evidence to show murder's occurring on Air Force base established federal jurisdiction under 18 U.S.C. §§ 1111 and 3236) (citing *Parker*, 622 F.2d 298); *United States v. Dufur*, 648 F.2d 512, 514 (9th

light of this Court's ruling that Section 1959 offenses constitute continuing offenses whose venue is properly governed by Section 3237(a), however, we need not answer this question today.

It is the government's burden, ultimately, to prove that the murder of Quinones occurred within the larger framework of a RICO enterprise and was not a solitary act unrelated to the dealings of the Latin Kings. As the indictment stands, however, Ramos has not been charged with a solitary act of murder, but a murder inextricably entwined with his membership in the Latin Kings. As such, Section 3237(a) governing the venue of continuing and conspiratorial offenses governs, and the motion to dismiss for lack of venue will be denied.

### IV. *Perez's Recorded Telephone Conversations With MCC Inmates Will Not Be Suppressed*

Perez has moved to suppress tape recorded telephone conversations he had with inmates at the MCC. Perez argues that, because the conversations were recorded without either an order pursuant to 18 U.S.C. § 2510 or consent of a participant in the conversations, the interception of those conversations violated his rights under the Fourth, Fifth and Sixth Amendments.

If, however, one participant in the conversations consented to the taping, either expressly or impliedly, the tapes were properly made and can be admitted against Perez. *See United States v. White*, 401 U.S. 745, 91 S.Ct. 1122, 28 L.Ed.2d 453 (1971). The government argues that the tapes are admissible because one participant to each conversation at issue, the MCC inmate, impliedly consented to the recording of their conversations.

To establish that the recordings were made with implied consent, the government has submitted evidence establishing that: (1)

inmates, upon admission to MCC, are provided with a handbook, published in English and Spanish, that explains the policy of monitoring inmate phone calls; (2) each inmate, including those with whom Perez had conversations, signed upon admission to the MCC a form confirming his understanding that his use of the telephone constitutes consent to the monitoring policy; and (3) signs are posted near the telephones in English and Spanish warning that calls are subject to monitoring.

In determining whether consent to a search was voluntary, courts are charged with considering the "totality of the circumstances." *See United States v. Kon Yu–Leung*, 910 F.2d 33, 41 (2d Cir.1990). Perez argues that the government has not satisfied its burden of demonstrating voluntary consent, as it has not submitted evidence that the individuals who placed the calls at issue here were provided with and read the handbook, or understood and remembered the content of the form they signed upon their admission to the MCC.

The Court of Appeals, however, has held that in circumstances indistinguishable from those here, inmates have impliedly consented to the recording of their telephone conversations. *See United States v. Workman*, 80 F.3d 688, 692 (2d Cir.1996); *United States v. Willoughby*, 860 F.2d 15, 19 (2d Cir.1988), *cert. denied*, 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); *United States v. Amen*, 831 F.2d 373, 377 (2d Cir.1987), *cert. denied*, 485 U.S. 1021, 108 S.Ct. 1573, 99 L.Ed.2d 889 (1988). As Perez notes, the facts in *Workman* are distinguishable from those here, as the *Workman* Court relied in part on the inmate's actual knowledge, as reflected in the conversations themselves, that the conversations were being recorded. *Workman*, 80 F.3d at 692 (on tapes, inmate "warned his

Cir.1980) (describing Section 3236 as Congress's "[changing] the common law rule to vest jurisdiction over a murder conviction in the district where injury was inflicted rather than where death occurred," and analyzing the question of where the death occurred or the injury was inflicted under Section 3236 in light of jurisdiction, not venue). Ramos's reliance on *United States v. Cores*, 356 U.S. 405, 407 & fn. 4, 78 S.Ct. 875,

877 & fn. 4, 2 L.Ed.2d 873 (1958) is misplaced inasmuch as it does not reach the essential question as to whether or not Ramos's charge under Section 1959 constitutes a continuing offense. While it is true that the *Cores* Court cited Section 3236 as a statute fixing venue, it did so in reference to the unitary acts of murder and manslaughter, and not in reference to acts within a larger conspiracy governed by 3237(a).

interlocutors that the call might be monitored").

In *Amen* and *Willoughby*, however, there was no such evidence of actual knowledge, and the Court of Appeals nonetheless found that the inmates in question had voluntarily consented to monitoring, based on their having signed forms similar to those signed by the inmates with whom Perez spoke, and received handbooks similar to those given to the inmates with whom Perez spoke, and based upon the posting near the telephones of the same bilingual notices posted at MCC. *Willoughby*, 860 F.2d at 19; *Amen*, 831 F.2d at 377.

■ Indeed, *Willoughby* can be read to hold that, as a matter of law, as long as inmates are informed of a prison's monitoring policy, recordings of telephone calls made by prison inmates are admissible:

> In the prison setting, when the institution has advised inmates that their telephone calls will be monitored and has prominently posted a notice that their "use of institutional telephones constitutes consent to this monitoring," the inmates' use of those telephones constitutes implied consent to the monitoring.

*Willoughby*, 860 F.2d at 20. Thus, while in the instant case, the government has not submitted evidence of the inmates' actual knowledge of the monitoring, it has nonetheless satisfied its burden of demonstrating that the inmates with whom Perez spoke had impliedly consented to the recording of their telephone conversations with Perez. Accordingly, Perez's motion to suppress those recordings will be denied.

## V. *Defendants Requests for Discovery and Bill of Particulars*

### A. *Bills of Particulars*

Perez and Ramos each move for a bill of particulars. The information sought includes, among other things, the names and addresses of all unnamed co-conspirators; each overt act allegedly committed in furtherance of the conspiracy; the government's theory as to the motive underlying each violent crime charged in the indictment; and

the precise manner in which the violent acts are alleged to have been committed.

■ A motion for a bill of particulars is directed to the discretion of the Court. *Wong Tai v. United States*, 273 U.S. 77, 82, 47 S.Ct. 300, 302, 71 L.Ed. 545 (1927); *United States v. Salazar*, 485 F.2d 1272, 1278 (2d Cir.1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974). A bill of particulars is meant to apprise the defendant of the essential facts of a crime and should be required only where the "charges of an indictment are so general that they do not advise a defendant of the specific acts of which he is accused." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir.), *cert. denied*, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990) (quoting *United States v. Feola*, 651 F.Supp. 1068, 1132 (S.D.N.Y.1987), *aff'd*, 875 F.2d 857 (2d Cir.), *cert. denied*, 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989)); *United States v. Leonelli*, 428 F.Supp. 880, 882 (S.D.N.Y.1977).

■ A bill of particulars is not an investigative tool which a defendant can use to force the government to preview its evidence or expose a legal theory. *United States v. Gottlieb*, 493 F.2d 987, 994 (2d Cir.1974). *See United States v. Wilson*, 565 F.Supp. 1416, 1439 (S.D.N.Y.1983) and cases cited therein. Because a bill of particulars confines the government's proof to the particulars furnished, *United States v. Glaze*, 313 F.2d 757, 759 (2d Cir.1963), requests for bills of particulars should not be granted where the consequence of granting the request would be to unduly restrict the government's ability to present its case. *See United States v. Massino*, 605 F.Supp. 1565, 1582 (S.D.N.Y.1985).

Rather, its purpose "is to inform the defendant as to the crime for which he must stand trial, not to compel disclosure of how much the government can prove and how much it cannot nor to foreclose the government from using proof it may develop as the trial approaches." *United States v. Malinsky*, 19 F.R.D. 426, 428 (S.D.N.Y.1956).

Moreover, it is improper to use a bill of particulars to force the government to disclose the manner in which it will attempt to prove the charges in the indictment or to

reveal the precise manner in which those crimes were committed. *United States v. Wilson,* 565 F.Supp. 1416, 1438–39 (S.D.N.Y. 1983); *United States v. Andrews,* 381 F.2d 377, 378 (2d Cir.1967), *cert. denied,* 390 U.S. 960, 88 S.Ct. 1058, 19 L.Ed.2d 1156 (1968). The "manner or means by which a crime is carried out constitute evidentiary matter, not ultimate facts...." *United States v. Boneparth,* 52 F.R.D. 544, 545 (S.D.N.Y.1971). As this Court stated in *United States v. Persico,* 621 F.Supp. 842, 868 (S.D.N.Y.1985):

> [The defendants] are not entitled to know ... the means by which it is claimed they performed acts in furtherance of the conspiracy nor the evidence which the government intends to adduce to prove their criminal acts, [beyond what is charged in the indictment]. Details as to how and when the conspiracy was formed, or when each participant entered it, need not be revealed before trial.

(citations omitted). *See also United States v. Cephas,* 937 F.2d 816, 823 (2d Cir.1991); *United States v. Torres,* 901 F.2d at 233–34.

In sum, the government is not required to provide information that would, in effect, provide the defendant before trial with a preview of the government's case, lest the defendant tailor his own testimony to explain away the government's case. *United States v. Cimino,* 31 F.R.D. 277, 279 (S.D.N.Y.1962), *aff'd,* 321 F.2d 509 (2d Cir.1963), *cert. denied,* 375 U.S. 974, 84 S.Ct. 491, 11 L.Ed.2d 418 (1964).

 Here, the indictment itself provides the following information: (1) descriptions of the objects, means and methods of the enterprise; (2) the dates of each alleged violent act; (3) the name and alias of the victims of each alleged violent act; (4) the nature of each specific violent act (*e.g.,* murder, attempted murder, conspiracy to commit murder); and (5) the fact that a 9 millimeter caliber handgun was used or carried in connection with each violent act.

In addition, the government has provided or made available for inspection extensive discovery to supplement the information provided in the indictment. This discovery includes: records maintained by the enterprise pertaining to its activities; crime scene pho-

tographs; evidence recovered from crime scenes and other sources; autopsy reports; telephone records; items seized from the defendants and victims; post-arrest statements made by the defendants; ballistics reports; and video and audio tapes obtained during the government's investigation. Furthermore, the discovery already provided includes not only materials relating directly to the violent acts charged in the indictment, but also materials relating to the enterprise, including virtually all discovery materials provided to the defendants in a related case charging numerous other members of the enterprise, *United States v. Luis Felipe, et al.,* S16 94 Cr. 395 (JSM). Finally, in response to defendant Ramos's request, the government has identified when and where the Benjamin Quinones homicide occurred.

The indictment, as well as the discovery already provided, include ample information sufficient to allow each defendant to prepare a defense, to avoid unfair surprise and to preclude a second prosecution for the same offense. *See United States v. Bortnovsky,* 820 F.2d 572, 574 (2d Cir.1987). Defendants' attempts to receive more information will be denied.

 Specifically, Defendants' demands seeking disclosure of the government's legal theory are not within the proper scope of a bill of particulars. *See, e.g., United States v. Shoher,* 555 F.Supp. 346, 350 (S.D.N.Y.1983); *United States v. Mannino,* 480 F.Supp. 1182, 1185 (S.D.N.Y.1979). The government is not required to provide the dates when each of the defendants allegedly joined the conspiracy. Courts have consistently rejected demands for particulars as to the formation of a conspiracy or entry into the conspiracy of a particular defendant or confederate. *See, e.g., Wilson,* 565 F.Supp. at 1439 ("'To require the government to specify the exact date when and the place where a particular defendant knowingly attached himself to the claimed conspiracy ... would unduly restrict the government's proof.'") (quoting *United States v. Kahaner,* 203 F.Supp. 78, 84 (S.D.N.Y.1962), *aff'd* 317 F.2d 459 (2d Cir.), *cert. denied,* 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963)); *see also Torres,* 901 F.2d

at 233–34; *United States v. Morales,* 1993 WL 465209, *3 (S.D.N.Y.1993) (requests for "particulars regarding defendants' involvement with the conspiracy ... are routinely denied in the Second Circuit ... particularly where defendants demand to know the 'whens' 'wheres' and 'with whoms' of acts and participation in the charged conspiracy"); *United States v. Iannelli,* 53 F.R.D. 482, 483 (S.D.N.Y.1971).

Likewise, the government is not required to provide further specification of the particular acts that the Defendants are alleged to have participated in, had knowledge of, or are being held responsible for. *See United States v. Cephas,* 937 F.2d 816, 823 (2d Cir. 1991), *cert. denied,* 502 U.S. 1037, 112 S.Ct. 884, 116 L.Ed.2d 788 (1992); *Torres,* 901 F.2d at 233–34; *see also United States v. Padilla,* 1994 WL 681812, at *11 (S.D.N.Y. Dec. 5, 1994) (government not required to set forth the location of each predicate act or details concerning meetings at which defendant was present).

In light of the information provided in the indictment and through discovery, Defendants' requests for bills of particulars will be denied.

### B. *Production of a List of Witnesses*

■ Defendant Ramos seeks to compel the government to produce a list of government witnesses. In *United States v. Cannone,* 528 F.2d 296 (2d Cir.1975), the Court of Appeals specified that in determining whether disclosure of a witness list was appropriate, the defendant's specific need for the information "should be balanced against the 'possible dangers accompanying disclosure (*i.e.* subornation of perjury, witness intimidation, and injury to witnesses).'" *United States v. Cafaro,* 480 F.Supp. 511, 520 (S.D.N.Y.1979) (quoting *Cannone,* 528 F.2d at 302).

■ "[A]bsent 'some particularized showing of need,' the defendant is not entitled to lists of government witnesses...." *Wilson,* 565 F.Supp. at 1438. "[A]n abstract, conclusory claim that such disclosure [is] necessary," such as the defendants make in this case, is simply not sufficient to make the requisite showing. *Cannone,* 528 F.2d at 301–02. Ramos' assertion that he is indigent and in pretrial detention do not distinguish him from many other defendants, and it is not clear why a witness list is any more necessary to a detained defendant than to one released on bail. Moreover, given the nature of the charges and the possibility of witness intimidation in this case, there is substantial reason to deny defendant Ramos' conclusory claims. *See United States v. Taylor,* 707 F.Supp. 696, 703 (S.D.N.Y.1989) ("[W]here the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great, the defendant's request for a witness list should not be granted absent a particularized showing of need.").[3]

The government has agreed, with respect to all witnesses whom it will call to testify, to comply with the requirements of 18 U.S.C. § 3500 and with its responsibilities under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, such as *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and *Kyles v. Whitley,* —— U.S. ——, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995). Consistent with government practice, any such information will be provided in advance of each witness's testimony. The Defendants have made no specific showing why such a practice is not adequate in the instant case, and therefore Defendants' motions for pretrial disclosure of the identity of government witnesses will be denied.

**3.** None of the cases Ramos cites as examples in which district courts ordered the government to supply witness lists involved a violent offense. *See United States v. Turkish,* 458 F.Supp. 874, 880–81 (S.D.N.Y.1978) (conspiracy to defraud the United States); *United States v. Baum,* 482 F.2d 1325 (2d Cir.1973) (unlawful possession of property stolen from interstate transportation); *United States v. Shoher,* 555 F.Supp. 346 (S.D.N.Y.1983) (charges of mail and wire fraud; specifically noting significance of fact that no violent crimes charged); *United States v. Kearney,* 436 F.Supp. 1108 (S.D.N.Y.1977) (obstruction of correspondence and related offenses); *United States v. Greater Syracuse Bd. of Realtors,* 438 F.Supp. 376 (N.D.N.Y.1977) (antitrust conspiracy).

## C. *Jencks Act, Brady, and Impeachment Material*

Ramos requests that disclosure of exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), impeachment material under *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), and Jencks Act materials under 18 U.S.C. § 3500, be made immediately or at a specified date in advance of trial.

With respect to Ramos' request for exculpatory material pursuant to *Brady,* the government has represented that it is continuing to review the evidence in the case, but is aware of no such material relating to either defendant at this time.

Courts in this Circuit have repeatedly denied pretrial requests for discovery orders pursuant to *Brady* where the government, as here, has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady.* *See, e.g., United States v. Schwimmer,* 649 F.Supp. 544, 549 (E.D.N.Y.1986); *United States v. Massino,* 605 F.Supp. 1565, 1581 (S.D.N.Y.1985), *rev'd on other grounds,* 784 F.2d 153 (2d Cir.1986). The government has thus far met its *Brady* obligations and will continue to comply with those obligations.

Ramos also has moved to require disclosure of *Brady* material of an impeachment nature, *i.e., Giglio* material, as soon as it becomes known. *Brady,* however, establishes no general right of pretrial discovery and gives rise to no pretrial remedies. *See Weatherford v. Bursey,* 429 U.S. 545, 559, 97 S.Ct. 837, 51 L.Ed.2d 30 (1977); *United States v. Evanchik,* 413 F.2d 950, 953 (2d Cir.1969). "Neither *Brady* nor any other case ... requires that disclosure under *Brady* must be made before trial." *United States ex rel. Lucas v. Regan,* 503 F.2d 1, 3 n. 1 (2d Cir.1974), *cert. denied,* 420 U.S. 939, 95 S.Ct. 1149, 43 L.Ed.2d 415 (1975); *United States v. Matos–Peralta,* 691 F.Supp. 780 (S.D.N.Y.1988).

Due process requires only that a defendant receive such information before it is too late for him to make beneficial use of it at trial. *United States v. Olson,* 697 F.2d 273, 275 (8th Cir.1983); *Shoher,* 555 F.Supp. at 352 (accused to receive *Brady* material in time to permit effective "evaluation, preparation, and presentation at trial") (quoting *United States v. Deutsch,* 373 F.Supp. 289, 290 (S.D.N.Y.1974)). Accordingly, *Brady* "impeachment" information is properly disclosed when the witness is called to testify at trial. *See United States v. Higgs,* 713 F.2d 39, 44 (3d Cir.1983), *cert. denied,* 464 U.S. 1048, 104 S.Ct. 725, 79 L.Ed.2d 185 (1984) (evidence going to the credibility of government's witness may be disclosed on day witness testifies); *United States v. Biaggi,* 675 F.Supp. 790, 812 (S.D.N.Y.1987) (*Brady* information bearing on witness credibility to be turned over at same time as other 18 U.S.C. § 3500 materials); *United States v. Abrams,* 539 F.Supp. 378, 390 (S.D.N.Y.1982) (*Brady* does not require the government to disclose information pertaining to the credibility of a witness before that witness testifies).

Following the usual practice in this District, the government has agreed to make impeachment information available to the defense at the same time as Jencks Act material, *i.e.,* "one day prior to the day the witness is called to testify on direct examination," or, if additional time is reasonably required to review such material, sufficiently in advance of the witness' testimony so as to avoid any delay at trial. *United States v. Gutierrez–Flores,* 1994 WL 558034, at *3 (S.D.N.Y. Oct. 11, 1994); *see also Biaggi,* 675 F.Supp. at 812 (*Brady* information bearing on witness credibility to be turned over at same time as Jencks Act materials). This practice will allow defense counsel adequate time to prepare for cross-examination of government witnesses as they testify at trial.

The Court accepts the government's representation that it will provide timely disclosure if any *Brady* material comes to light.

## D. *Prior Offenses*

Ramos requests disclosure of evidence of all other crimes, wrongs or acts that the government intends to introduce at trial, pursuant to Fed.R.Evid. 404(b). Rule 404(b) requires that the government provide "reasonable notice in advance of trial ... of the general nature of any such evidence it in-

tends to introduce at trial." Fed.R.Evid. 404(b).

Pursuant to Rule 404(b), the admissibility of prior crimes evidence against Ramos will depend on whether the prior crimes are relevant to some issue at trial, and whether the probative value of such evidence outweighs its prejudicial impact. *United States v. Mohel,* 604 F.2d 748, 751 (2d Cir.1979); *United States v. Lyles,* 593 F.2d 182, 193 (2d Cir.), *cert. denied,* 440 U.S. 972, 99 S.Ct. 1537, 59 L.Ed.2d 789 (1979). An assessment of the relevance and the prejudicial and probative value of evidence of Ramos' prior crimes must await trial. Accordingly, Ramos may renew his motion to preclude such evidence at a later date.

### VI. *Hearings Will Be Held Regarding Ramos' Post–Arrest Statement and the Search of Perez's Father's Apartment*

Ramos alleges that a statement he made to police following his arrest was improperly elicited in violation of the Fifth and Sixth Amendments. In order to determine the merit of these contentions, and the admissibility of Ramos' post-arrest statement, a hearing is required to resolve the circumstances surrounding Ramos' statement. Based on the affidavit submitted by Ramos describing his post-arrest communication with police, Ramos' motion to suppress his statement will be granted to the extent that a hearing will be held on September 17, 1996 at 10AM.

Perez contends that the fruits of a warrantless search of his father's apartment should be suppressed, as the search was executed without consent and therefore violated Perez's Fourth Amendment rights. A hearing is required to determine whether Perez's father validly consented to the search of the apartment, and whether the fruits of that search will be admitted into evidence against Perez. Based on the affidavit submitted by Perez's father describing the circumstances surrounding the search, Perez's motion to suppress the fruits of that search will be granted to the extent that a hearing will be held on September 17, 1996 at 10AM.

*Conclusion*

For the reasons set forth above, Defendants' motions are hereby denied in part and granted in part.

It is so ordered.